# UNITED STATES DISTRICT COURT
# DISTRICT OF IDAHO

| | |
|---|---|
| ROXANNE L. SLAUGH, an individual in her capacity as Successor Trustee of the Neidigh Trust, dated April 21, 2010 and amended June 10, 2015<br><br>    Plaintiff,<br><br>vs.<br><br>MARIANNE POSELEY WAGNER MARRQUARDT NEIDIGH,<br><br>    Defendant. | Case No.: 2:15-cv-00555-REB<br><br>**MEMORANDUM DECISION AND ORDER RE: DEFENDANT'S MOTION TO ENFORCE SETTLEMENT AGREEMENT**<br><br>**(Docket No. 66)** |

Now pending before this Court is Defendant's Motion to Enforce Settlement Agreement (Docket No. 66). Having fully reviewed the record herein, the Court finds that the facts and legal arguments are adequately presented in the briefs and record. Accordingly, in the interest of avoiding further delay, and because the Court conclusively finds that the decisional process would not be significantly aided by oral argument, this Motion will be decided on the record before the Court and without oral argument.

## BACKGROUND

On May 3, 2017, the parties appeared to informally resolve the instant action (along with other state court actions – two in Idaho and one in California), following a settlement conference with U.S. Magistrate Judge Candy W. Dale. *See* 5/3/17 Minute Entry (Docket No. 60) ("The parties and their representatives met, negotiated in good faith, and have reached a final settlement agreement."). A status conference followed on May 9, 2017 to discuss additional "settlement details," with Judge Dale inviting the parties to contact her "if further assistance is

**MEMORANDUM DECISION AND ORDER - 1**

needed." 5/9/17 Docket Text Minute Entry (Docket No. 65). Unfortunately, the parties reached an impasse when trying to finalize the particulars of their "settlement" agreement. The at-issue Motion followed on May 28, 2017.

The lawsuits involve disputes related to the estate of Robert Neidigh. Now deceased, Mr. Neidigh is Plaintiff's (the successor trustee of the Neidigh Trust) father and Defendant's husband. Though the facts and circumstances surrounding these actions are both sensitive and contentious, they are not material to resolving the question of whether the parties reached a settlement agreement on May 3, 2017 (except to perhaps foreshadow the current state of affairs) and, if so, what the consequences of that agreement are. Those lynchpin issues turn on the manner in which Mr. Neidigh's estate's assets are to be distributed.

Relevant here, the parties agreed that Plaintiff would receive $136,000, and that such amount be funded by (1) the balance of the IBEW retirement account, and (2) such portion of the Fidelity account to bring the monetary distribution to Plaintiff to $136,000. *Compare* Def.'s Mem. in Supp. of Mot. to Enforce, p. 4 (Docket No. 66, Att. 1), *with* Pl.'s Resp. to Mot. to Enforce, p. 3 (Docket No. 71).[1]

In correspondence following the May 3, 2017 settlement conference, the issue of taxes (or, more specifically, the tax consequences of any distribution) came up in. For example:

> 5/6/17 Email from Simpson to Fulgham: "I will try to summarize my question[ ] which is an issue that was not discussed. Your client is to receive all or part of the

---

[1] Several other distributions to Plaintiff were negotiated as well, including half of any money in the Fidelity account in excess of $42,000, 11 gold coins, a motorcycle, family pictures, and select firearms. *Compare* Def.'s Mem. in Supp. of Mot. to Enforce, pp. 4-5 (Docket No. 66, Att. 1), *with* Pl.'s Resp. to Mot. to Enforce, pp. 3-4 (Docket No. 71). Defendant was to receive the balance of Mr. Neidigh's estate (though some uncertainty evolved with respect to the El Dorado account). *See id*.

**MEMORANDUM DECISION AND ORDER - 2**

> retirement account and the IRA. It was not discussed that your client intended to take a distribution of the retirement or the IRA account. After the fact, you have indicated that you want Roxanne's portion of these account to go to your trust account. It probably does not make any difference how your client receives the money as long as she discloses where she intends to report it as income and how is the tax being paid. As you are aware when the funds are distributed from either of these account[s], the distribution amount must be reported as income and tax paid. My question is where is the income to be reported and who is going to pay the tax[?] These issues were not raised or discussed in our session. If your client is going to receive the distribution as Trustee of the 2010 trust does she intend to file a trust return and where is the money going to come from to pay the tax[?] An answer to these questions may resolve the necessity for a conference call with the Judge.
>
> As to any portion of the IRA to be allocated to Marianne, she will roll it over into another qualified account so the only portion that would go to your trust account is what Roxanne is to receive."
>
> 5/9/17 (11:54 a.m.) Email from Fulgham to Simpson: "Regarding the $136,000 payment – Since your settlement offers, which we accepted, agreed to pay Roxanne Slaugh $136,000 (which we require to be paid c/o Lukins & Annis PS [(Plaintiff's counsel)] trust account) why don't we have the distribution be to the surviving spouse, with direct payment to Roxanne Slaugh c/o Lukins & Annis PS? You wanted Marianne to get the remainder of THE ESTATE anyway (besides the coins and Harley), so I think during the mediation negotiations you wanted to just pay our side the funds of $136,000, and the Estate then goes to Marianne. She handles the taxes, the roll over, the real estate, etc."
>
> 5/9/17 (12:02 p.m.) Email from Fulgham to Simpson: "To be clear, our side gets $136K, the coins, the Harley, and the remainder of the ESTATE goes to Marianne. She handles the entire Estate so she pays the taxes."

*See* Exs. attached to Simpson Decl. (Docket No. 66, Atts. 6 & 8); *see also* Exs. attached to Fulgham Decl. (Docket No. 73); Exs. attached to Osler Decl. (Docket No. 72). Unable to resolve the matters themselves, the parties proceeded to the May 9, 2017 status conference with Judge Dale. *See* 5/9/17 Status Conf. Tr. at 2:15-20 (Docket No. 73) (Judge Dale framing issue as: "But in reviewing the emails, it's my sense that you both agree that there is a settlement agreement in principle and the issue that may be interfering, a hurdle at this point is potential tax

**MEMORANDUM DECISION AND ORDER - 3**

consequences based on how the property that's at issue is going to be distributed."). At that time, the parties initially relayed their respective positions as follows:

| | |
|---|---|
| Mr. Simpson: | It's not going to be – it's not going to be Marianne because she's not going to be liable for the tax. If you can figure out a way to transfer those assets to the trust and there's absolutely no potential liability for Marianne, I don't have any real problem with it but I don't see where the trust gets away without paying any tax whatsoever. |
| Ms. Fulgham: | Well, that was part of my proposal in the last round of e-mails, Brian, was that the agreement is Roxanne gets $136,000 and we believe the only source for those funds were these two accounts and so Marianne could take distribution of those accounts but the payment would go to Roxanne because – |
| Mr. Simpson: | That would be a taxable event to her. She'd be subject to the tax. |
| Ms. Fulgham: | But she's going to be dealing with everything else in the estate anyway. I mean she's – |
| Mr. Simpson: | She's not going to pay the tax. We've got to figure out a way – |
| Ms. Fulgham: | She's going to have to do it in state tax returns on the three houses and – |
| Mr. Simpson: | No, she doesn't. No, she doesn't. There's an exemption of $5.3 million. Why would she have to file a Form 70 (inaudible)? That has nothing to do with the tax. There's no inheritance – or death tax. We can't give it to Marianne. She has to pay the tax. If your client wants to take the net after the tax, I don't have any problem but I suspect she doesn't want to do that. |
| Ms. Fulgham: | No, because the deal was she gets 136,000 and not 136 minus 25 or 30 percent or whatever taxable – |
| Mr. Simpson: | I understand that but you insisted that it come out of that account. That wasn't our doing. |

**MEMORANDUM DECISION AND ORDER - 4**

| | |
|---|---|
| Ms. Fulgham: | Well, it was – we were not going to wait until the sale of the real property. |
| Mr. Simpson: | I understand that. But it was your insistence that these accounts get paid to you and I don't have any problem with it and I suggested a way in which everybody gets out of this thing without any tax. |

*Id*. at 8:1-9:11.

As the conference progressed, however, the parties seemed to agree upon an action plan to address the tax issue (involving either (1) a court order naming Plaintiff the beneficiary direct and transferring the money to Lukins & Annis, P.S. trust account in the care of Plaintiff, or, if not possible, (2) a court order decreeing that the beneficiary is the Neidigh Trust as amended by Plaintiff, with the money being charged to Plaintiff's attorneys' fees by agreement). *See* Pl.'s Resp. to Mot. to Enforce, p. 6 (Docket No. 71) (citing 5/9/17 Status Conf. Tr. at 11:1-13:25 (Docket No. 73)); *see also* 5/9/17 Status Conf. Tr. at 19:13-16 (Docket No. 71) (Judge Dale commenting at conclusion of status conference: "Okay. It sounds like you're headed in the right direction. Both of your clients want this property distributed and you're going to make sure it gets distributed in away that has [the] least if no tax consequences. Okay?").

After securing the necessary authorizations and speaking with representatives familiar with the IBEW retirement account and Fidelity, things began to unravel following the May 9, 2017 status conference, with the parties again drawing lines in the sand reflecting their respective positions on the fomenting tax issue. For example:

<u>5/11/17 (11:31 a.m.) Email from Osler to Simpson</u>: "We just talked with Mr. Grosboll and a Fidelity representative and have been informed of the following:

Regarding the Plan/Pension account, because the account is an ERISA account the Plan will be taking taxes (20%) out prior to any funds being disbursed. This is apparently required by ERISA law and is automatic. We cannot elect to receive the entire amount and pay taxes on it in the future. Thus, Roxanne will only be receiving

**MEMORANDUM DECISION AND ORDER - 5**

approximately $88,186.27 of the Pension/Plan account, not the $110,232.83 we initially thought.

Next, in speaking with Fidelity if the funds are transferred to an IRA established by Roxanne and she then takes the money out of the IRA account to pay us for her attorneys fees, this will trigger a taxable event. If the funds are transferred to the Lukins & Annis, Trust Account c/o Client: Roxanne Slaugh this will also trigger a taxable event. Someone will be paying taxes on this money however it is paid out because it will not sit in an IRA account but rather will be used to pay her attorneys fees. As such, we were advised by Fidelity that Roxanne should elect to have 20% deducted prior to any disbursement of the funds as this is the cleanest procedure.

Given this information the math changes as follows (with the understanding that these amounts fluctuate daily):

Plan/Union account $110,232.83 – 20% taxes = $88,186.27
Fidelity Account $44,575.27 – 20% taxes ($8,915.05) = $35,660.21

Total: $123,846.48.

Thus the entire funds from the Plan/Union account and the Fidelity account will be disbursed to Roxanne. This leaves $12,153.52 remaining that needs to be addressed in order to ensure that Roxanne receives the $136,000 per the settlement agreement. The next option would be to have funds from the Lukins & Annis, P.S. IOLTA account paid to Roxanne, Trustee. As you know our Lukins & Annis Trust account has $13,926.21 in it. Roxanne would receive $12,153.52 from this account and Marianne would receive the remaining balance of $1,772.69 from this account. I am anticipating your response to this as negative. So before you go there I just want to point out that Roxanne was awarded $136,000 pursuant to the settlement agreement. It was discussed on the record that the first place that this amount comes form is the Union/Pension account and then the Fidelity account. We believe the next plausible place is the IOLTA account as that is the only other money account. . . . ."

5/11/17 (2:13 p.m.) Email from Simpson to Osler: "The agreement in the phone call with the Judge was that you[ ] will receive[ ] funds from the accounts. There was not discussion of withholding tax and that is simply something that your client has to work out. My client will not pay any tax for your client to take out the funds. A deal is a deal. Your client gets the union account is the entire $110,000 is [sic] chargeable to her. The withholding will have to be something that she works out. You cannot keep changing the agreement."

5/11/17 (2:30 p.m.) Email from Fulgham to Simpson: "Our client gets $136,000. That was the agreement at mediation and on the phone. Not a penny less. She will

**MEMORANDUM DECISION AND ORDER - 6**

not get $136k from either the union or the fidelity accounts. They are keeping the 20%, it won't be distributed to us.

How does your client want to make up the difference? The source of that $136,000 will have to come from Union $88k, Fidelity $34k and IOLTA $13k approximately.

How else can your client pay the $136k that is owed to Roxanne to settle?"

5/11/17 (2:41 p.m.) Email from Simpson to Fulgham: "My client will not make up the difference. The withholding is only that you[r] client will put the distribution on her tax return and take you[r] fees as a deduction and then she will get a refund. The whole problem arose because you want the early cash. We originally proposed that she get her money out of the sale of the property, which would then be an inheritance and not taxable."

5/11/17 (2:47 p.m.) Email from Fulgham to Simpson: "We agreed the $136k are to be paid from the funds first. We have not agreed who exactly will take the distribution. Since both funds have Marianne listed as the surviving spouse beneficiary so [sic] we can word the Court Order so Marianne can take the distribution. She can then pay the taxes, and then pay $136k to Roxanne. Work for you and your client?

5/11/17 (4:57 p.m.) Email from Fulgham to Simpson: "It is clear from your [(5/6/17)] email . . . that the tax liability was not discussed and was not part of the specific terms of our mediated settlement agreement for $136K. Please see you[r] language below.

Based on what we now know from the union and fidelity, the funds will not leave their possession without the 20% tax being paid. Roxanne must receive $136k either from Marianne (after Marianne pays the 20% taxes) or Roxanne must receive $136k from the union, fidelity, and the IOLTA accounts (after Roxanne pays the tax).

I will draft the Agreement and Order for Marianne to receive the funds, pay the tax, and transfer the $136K to Roxanne – since Marianne is already listed as the designated beneficiary with the union and fidelity.

*See* Exs. attached to Simpson Decl. (Docket No. 66, Atts. 6 & 8); *see also* Exs. attached to Fulgham Decl. (Docket No. 73); Exs. attached to Osler Decl. (Docket No. 72).

From this, it is clear that the parties originally anticipated that the product of the May 3, 2017 settlement conference would once and for all resolve all of the pending actions relating to

**MEMORANDUM DECISION AND ORDER - 7**

Mr. Neidigh's estate. Unfortunately, progress toward that end stalled when the parties disagreed about the tax implications involved with distributing the assets in the manner contemplated (specifically via the IBEW retirement and Fidelity accounts) in order to immediately secure the $136,000 amount. The impact of such taxable events upon whether an agreement had, or had not, been reached is now the subject of Defendant's Motion to Enforce Settlement Agreement. *See* Def.'s Mem. in Supp. of Mot. to Enforce, p. 6 (Docket No. 66, Att. 1) ("The new term Roxanne wants to impose stems from her apparent[ ] realization after the fact that withdrawing funds from the IBEW and Fidelity accounts would be a taxable event. Both of the administrators require that 20% of the distribution be withheld as a deposit for that purpose. . . . Roxanne insists that Marianne be responsible for the 20% withheld and any taxes ultimately due so that she gets her $136,000 immediately.").

## DISCUSSION

The parties agree that the Court has the authority to enforce a settlement agreement entered into by them while the action remains pending. *See id*. at p. 6; *see also* Pl.'s Resp. to Mot. to Enforce, p. 8 (Docket No. 71). The enforcement of settlement agreements is "governed by principles of local law which apply to interpretation of contracts generally" and, on this record, Idaho contract law applies. *Jeff D. v. Andrus*, 899 F.2d 753, 759 (9th Cir. 1989).

Generally, oral settlement agreements need not be reduced to writing to be enforceable. *See McColm-Traska v. Baker*, 88 P.3d 767, 770 (Idaho 2004) (citing *Lyle v. Koubourlis*, 771 P.2d 907, 909 (Idaho 1988)). Thus, for enforcement of an oral settlement agreement, there must be mutual intent to contract, and a meeting of the minds regarding the essential terms of the agreement. *See Lawrence v. Hutchinson*, 204 P.3d 532, 538 (Idaho Ct. App. 2009). A "contract

must be complete, definite, and certain in all its material terms, or contain provisions which are capable in themselves of being reduced to certainty." *Id*. (citations omitted).

Here, each party agrees that a settlement agreement was reached. Their dispute at this juncture revolves around who – Plaintiff or Defendant – is responsible for the estimated 20-30% in taxes owed in any disbursement from the IBEW retirement and Fidelity accounts. On one hand, Defendant argues that the May 3, 2017 settlement should be enforced and that Plaintiff "accept the assets [she and her attorneys] insisted b[e] distributed to Roxanne". Def.'s Mem. in Supp. of Mot. to Enforce, p. 10 (Docket No. 66, Att. 1). On the other hand, Plaintiff likewise argues that the May 3, 2017 settlement be enforced, but that Defendant be "legally responsible for taxes of the estate." Pl.'s Resp. to Mot. to Enforce, pp. 10-13 (Docket No. 71).

After considering each party's position and carefully reviewing all of the documents submitted in support thereof, the Court determines that the parties knowingly and voluntarily entered into a settlement agreement following the settlement conference with Judge Dale on May 3, 2017, and that said agreement is enforceable. While more precision at the front end might have precluded the present disagreement, the fact that such additional detail was not specifically referenced does not operate to upend the agreement itself.

As in any contractual setting, the accounting for taxable events and/or withholdings may impose contingent liabilities to be "paid" by whoever has such liability (or other obligation) under the tax laws. Sometimes agreements are structured in advance to anticipate such circumstances, to the extent that such details can properly be organized to avoid tax liability instead of evading tax liability. Otherwise, as with any other contract, if there is a responsibility to pay such taxes because of some result of a settlement agreement, then a party to a settlement

agreement who has that responsibility ignores it at their peril. With this in mind, the Court is careful not to order matters that are properly dictated by tax law, and the parties here who have reached a settlement agreement do not have the right to insist upon such a reassembling of their settlement agreement. Nor, for that matter, should the Court impose a certain course of conduct upon such matters when doing so may inadvertently and inappropriately purport to require something different than what tax law requires.

Accordingly, the Court simply determines that the settlement agreement requires that Plaintiff receive $136,000, with the IBEW retirement and Fidelity accounts going toward that amount. *See* 5/3/17 Sett. Tr. at 4:12-5:22 (Docket No. 73) (Defendant's counsel stating: "I would say, I think we're trying to get to the same place. Counsel's client gets $136,000. The first place that comes from is the [(IBEW)] Union account. . . . Then the difference between whatever that account is and the 136 – comes out of Fidelity. Everything over that goes to Marianne, except if there's more than 42 – in that account, it gets split between the parties."). The corresponding tax implications involved in using these accounts to help finance the agreed-upon $136,000, if any, are not resolved here; tax law will dictate how such matters are to be handled moving forward.[2]

Defendant's Motion to Enforce Settlement Agreement is therefore granted to this extent only; to be clear, it is denied insofar as Defendant requests that (1) Plaintiff either take

---

[2] To illustrate, in part, the fact that the entity holding a particular account (here, for example, the IBEW or Fidelity accounts) may withhold for tax purposes a certain amount from an account upon a distribution from that account is not necessarily the same as a tax liability for the holder of the account. It is a withholding. Whether the holder of the account has the right to have some return of that amount directly, or in the form of a tax refund, or have it applied against some collective tax liability – such as in an estate income tax return – are separate issues. Similarly, whether the ultimate recipient of such funds (if that person is different than the holder of the account) has a tax liability is also a separate issue.

**MEMORANDUM DECISION AND ORDER - 10**

something less than $136,000 (as a result of taxes/withholding applied to any distributions from the IBEW retirement and Fidelity accounts), or (2) an order be entered obligating Plaintiff to account for any taxable events related to any distributions from these accounts.

**ORDER**

Based on the foregoing, IT IS HEREBY ORDERED that Defendant's Motion to Enforce Settlement Agreement (Docket No. 66) is GRANTED in part, and DENIED, in part. A settlement agreement exists between the parties and Plaintiff is to be paid $136,000, with the IBEW retirement and Fidelity accounts being applied toward that amount. In this respect, the Motion is GRANTED. To the extent Defendant requests that Plaintiff either take less than $136,000 and/or be ordered to account for any taxable events related to any distributions from these accounts, that request is rejected. In this respect, the Motion is DENIED. Defendant's request for an award of attorneys' fees and costs is also denied, as such an award is not supported by the facts of this case.

In light of this, (1) Defendant's Motion to Strike Plaintiff's Designation of Expert or Other Remedies (Docket No. 37), (2) Plaintiff's Motion for Summary Judgment (Docket No. 38), and (3) Defendant's Reply to Plaintiff's Objection to Motion to Strike Plaintiff's Designation of Expert or Other Remedies (Docket No. 49) (submitted as a motion on CM/ECF) are DENIED as moot.

DATED: **September 28, 2017**

Honorable Ronald E. Bush
Chief U. S. Magistrate Judge

**MEMORANDUM DECISION AND ORDER - 11**